The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | NO. CR11-228JLR |
| Plaintiff, ) | |
| ) | GOVERNMENT'S SENTENCING |
| v. ) | MEMORANDUM |
| ABU KHALID ABDUL-LATIF, ) | |
| Defendant. ) | |

## I.    Introduction.

The United States of America, by and through Jenny A. Durkan, United States Attorney for the Western District of Washington, and Todd Greenberg and Michael Dion, Assistant United States Attorneys, hereby files this Sentencing Memorandum regarding defendant Abu Khalid Abdul-Latif. For the reasons set forth herein, the government respectfully recommends that the Court sentence Abdul-Latif to a term of imprisonment of 19 years (228 months) and a term of supervised release for life.

This lengthy sentence is warranted because Abdul-Latif conceived of and planned a horrific crime, with a terrorism motive, that would have killed scores of military officers and employees, high school age military recruits, and other victims. The recordings and other irrefutable evidence in this case establish that the attack plot was Abdul-Latif's idea, he was enthusiastic about and committed to the attack, he recruited co-defendant Mujahidh into the plot, and he engaged in detailed planning to make it a reality. The fact

1    that the government's investigation used a confidential informant to investigate Abdul-

2    Latif's pre-existing plot, or that the investigation provided an opportunity for him to

3    pursue his plan, does not lessen or mitigate the defendant's culpability.

4    **II.    The Plea Agreement.**

5         On December 6, 2012, Abdul-Latif entered guilty pleas to the two most serious

6    charges contained in the Indictment: Conspiracy to Murder Officers and Employees of the

7    United States, in violation of Title 18, United States Code, Sections 1114(1) and 1117;

8    and Conspiracy to Use Weapons of Mass Destruction, in violation of Title 18, United

9    States Code, Sections 2332a(a)(2)(C) and (a)(3).  The Plea Agreement contains the

10   following statement of facts:

11        a.    During June 2011, Defendant Abu Khalid Abdul-Latif agreed with
          Wali Mujahidh and an informant to kill United States military personnel in
12        retribution for perceived wrongs committed by the United States military in
          the Middle East.  The specific object of the conspiracy was to kill officers
13        and employees of the Department of Defense who worked at the Military
          Entrance Processing Station ("MEPS") located in the Federal Center South
14        building at 4735 East Marginal Way, Seattle, Washington, and the security
          personnel at the Federal Center South building.
15
          b.    The Department of Defense operates numerous MEPS throughout
16        the United States.  Applicants seeking to join one of the branches of the
          United States Military, including the Army, Navy, Air Force, and Marines,
17        apply through and are processed at a MEPS.  A MEPS is staffed by United
          States Military personnel and other federal civilian employees.  The Federal
18        Center South building is owned and operated by the United States
          Government, General Services Administration.
19
          c.    During early June 2011, Abdul-Latif engaged in several telephone
20        conversations with Mujahidh and an informant who was working with law
          enforcement.  They discussed how the planned attack would be carried out.
21        For example, on June 6, 2011, Abdul-Latif spoke with Mujahidh over the
          telephone in the presence of the informant.  They discussed the general
22        nature of the conspiracy, including the need to acquire firearms for use in
          the attack, and their plan to train with the firearms in advance of the attack.
23
          d.    On June 8, 2011, Abdul-Latif and the informant conducted
24        surveillance at the Federal Center South building.  They drove to the
          building, parked in the main parking lot, and walked to the front door of the
25        building.  Abdul-Latif commented about observing surveillance cameras on
          the exterior of the building.  The informant commented, "There's a security
26        guard right there looking at you."  Abdul-Latif later said about the guard:
          "We'll just kill him right away. . . .  We can kill him first."
27
          e.    On June 8, 2011, Abdul-Latif discussed with the informant ordering
28        enough weapons for three people (referring to himself, Mujahidh, and the

informant), including three machineguns, multiple magazines for each firearm, and several hand grenades. Abdul-Latif also said that he was going to call the MEPS to find out what days the recruits are going to be there. Abdul-Latif commented that he wanted to "be there on a day when all the recruits there are processing. . . . I don't want to come there just to kill an old guard."

f.      On June 14, 2011, Abdul-Latif and the informant spoke with Mujahidh over the telephone. They discussed that Mujahidh would travel to Seattle from Los Angeles, California. Mujahidh wanted to travel by bus, and they booked a bus ticket for travel on June 20-21, 2011. Abdul-Latif purchased Mujahidh's bus ticket using his debit card, in part with $100.00 provided by the informant.

g.      On June 14, 2011, Abdul-Latif met with the informant, who had some of the weapons they had discussed purchasing for the attack. Abdul-Latif handled an inert fragmentation grenade, one Heckler & Koch MP-5 sub-machinegun, and one Colt M16A2 Commando machinegun. Abdul-Latif confirmed that the informant would purchase three of the M16A2 Commandos for the attack. On June 16 and 17, 2011, Abdul-Latif provided the informant with $800 cash to pay for the firearms. Abdul-Latif further instructed the informant to call him "as soon as you get everything," referring to the firearms.

h.      On June 21, 2011, after Mujahidh had arrived in Seattle, Abdul-Latif and Mujahidh met with the informant and further discussed the attack on the MEPS, including that they intended to use machineguns and grenades during the attack. Abdul-Latif referred to a sketch of the Federal Center South building floor plan and discussed where the men would go during the attack and where they would throw grenades, stating words to the effect: "We come up in here . . . we throw the grenade in there. . . . Move up, throw the grenade in here. . . . Have one of us wait on the corner . . . the other two keep going. . . . When you get here, we drop the grenade here. You get halfway down the hallway, we drop the grenade down here. We can throw one in the bathroom, too. . ."

i.      During this same conversation, Abdul-Latif stated: "We're gonna hit the [MEPS] commander. . . . The thing is, on Mondays and Tuesdays, those are the main days that they do full processing for soldiers getting ready to go to boot camp. So if we do something like this, it's gonna have to be on a Monday or a Tuesday. No other day than that. We're not going there to kill the security guard. There's no sense in that." Abdul-Latif also stated: "We're not only trying to kill people, we're trying to send a message. We're trying to get something that's gonna be on CNN and all over the world. . . . That's what we want."

j.      On June 22, 2011, Abdul-Latif and Mujahidh met with the informant to take possession of the machineguns that were previously ordered. During the meeting, Abdul-Latif, Mujahidh, and the informant each handled and inspected one of the machineguns. Moments later, Abdul-Latif and Mujahidh were arrested by FBI agents. The firearms consisted of a Colt M16A1, 5.56 mm caliber assault rifle, with serial number 9463259; a Colt M16A1, 5.56 mm caliber assault rifle, with serial number 9574856; and a Colt M16A1, 5.56 mm caliber assault rifle, with serial number 9396093.

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

k.    The parties agree that the Court may consider any and all additional facts contained in the Presentence Report and/or that may be presented by the United States or Defendant at the time of sentencing (subject to standard objections by the parties), and that the factual statement contained herein is not intended to limit the facts that the parties may present to the Court at the time of sentencing.

Plea Agreement ¶ 7.

The Plea Agreement was entered into pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), and contains an agreement that "the appropriate sentence to be imposed by the Court at the time of sentencing is a sentence of imprisonment within the range of 17-19 years (204-228 months)."  Plea Agreement ¶ 9.  Under the agreement, the parties are free to argue for the application of any Sentencing Guidelines provisions and to recommend any term of supervised release and conditions of supervision.  Plea Agreement ¶¶ 8, 9.

## III.    The Sentencing Guidelines Calculations.

The Presentence Report prepared by the Probation Office calculates the applicable Sentencing Guidelines as follows:

| | |
|---|---|
| Base offense level (§2A1.5): | 33 |
| Official victims (§3A1.2(b)): | +6 |
| Crime of terrorism (§3A1.4(a)): | +12 |
| <u>Acceptance of responsibility</u>: | <u>-3</u> |
| Total offense level: | 48 |

Although the defendant falls within criminal history category III using the standard Guidelines scoring rules, pursuant to the "Terrorism" enhancement found in USSG § 3A1.4(b), the criminal history category must be raised to the maximum of VI.  This becomes a moot point, however, because a total offense level of 48 is literally off the sentencing chart when coupled with any criminal history category.  The advisory Sentencing Guidelines range in this case is "life."

The government has no objection to the Probation Office's Guidelines calculations.  In various letters sent to the Probation Office, the defendant appears not to

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1  object to any of the above calculations, although he notes that a criminal history category

2  of VI overstates the actual seriousness of his criminal history.

3  **IV.    Analysis of the § 3553(a) Sentencing Factors.**

4  An analysis of this case through the prism of the various sentencing factors found

5  at Title 18, United States Code, Section 3553(a) supports the government's position that a

6  sentence of 19 years of imprisonment, followed by a life term of supervised release, is the

7  most appropriate sentence for Abdul-Latif.  The government will address the various

8  operable sentencing factors in turn below.

9  **A.    Nature and Circumstances of the Offense.**

10  There is no question that the offenses of conviction – Conspiracy to Murder

11  Federal Officers and Officials, and Conspiracy to Use Weapons of Mass Destruction –

12  are extremely serious.  Abdul-Latif planned and recruited others to participate in an attack

13  that was designed to kill – and certainly would have killed – scores of victims, including

14  U.S. military officers and civilian employees, high-school age military recruits, and other

15  intended and unintended victims.  A close look at various aspects of Abdul-Latif's

16  offense conduct supports a lengthy sentence of 19 years.

17  **1.    Abdul-Latif's Terrorism Motivation.**

18  Abdul-Latif did not intend to engage in a random mass killing – he wanted to kill

19  specific victims in order to send a political message.  Abdul-Latif wanted to kill U.S.

20  military employees and recruits in order to avenge what he perceived to be various

21  atrocities committed by the U.S. military in the Middle East.  This was a classic crime of

22  terrorism, as defined by federal law.  *See* 18 U.S.C. § 2332b(g)(5)(A) ("the term 'Federal

23  crime of terrorism' means an offense that – is calculated to influence or affect the conduct

24  of government by intimidation or coercion, or to retaliate against government conduct").

25  Throughout the recordings made by law enforcement during this investigation,

26  there are numerous examples of Abdul-Latif explaining the terrorism motivation behind

27  his planned attack:

28

GOVERNMENT'S SENTENCING MEMORANDUM - 5
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

- Abdul-Latif to Mujahidh and Childs: "We're not only trying to – we're not only trying to just kill people. We're trying to send a message. . . . We're trying to get something that's gonna be on CNN and all the world – all over the world, let people know. . . . That's - that's what we want. Not to be praised ourselves but to say, look, the Muslims, they not gonna allow this no more for you to go to their lands and kill and slaughter their people." Ex. A at 1-2.[1]

- Abdul-Latif to Childs, when asked what the purpose of his "mission" was: "I mean look, hey, you know, you're invading our land. You're stealing our resources. You're locking up our brothers and sisters. You're raping our sisters in Guantanamo Bay. You're in, you're in Islamic countries, even when you're asked to leave, you won't leave. And you're killing people, man. You know, you've seen those tapes on You Tube." Ex. A at 3-5.

- Abdul-Latif to Mujahidh and Childs: "Most [] of them people that are going into MEPS, getting out of high school or whatever and then going into the military, a majority of them are going to Afghanistan right now and Iraq. . . . They're being sent to the front lines to kill our brothers and sisters over there. I want, I'm gonna, I'm gonna go get my computer right now 'cause I'm gonna show you some of these videos of what I been talking about, you know?" Ex. A at 6-7.

- Abdul-Latif to Childs: "Well, you know, I mean, hitting the MEPS center, it sounds good to you. It sounds good to me. Insha'Allah th - there are no innocent civilians in the area. You know. Imagine – imagine how many young Muslims, after this, if we're successful at it, will try to hit these kinds of centers. Imagine how fearful America will be. And they'll know they can't push the Muslims around." Ex. A 8-9.

- Abdul-Latif to Wali Mujahidh: "There's some videos I want you to see, man. I want you to see why, you know – I be – why, uh, I'm joining up in this project. I want, I wanna show you some things that the U.S. military's done to our innocent Muslim brothers in Afghanistan and in uh – and in Iraq and other parts of the world. I got some stuff on video." Ex. A at 10-11.

Consistent with his plan to "send a message . . . all over the world," Abdul-Latif gave careful thought about who he wanted to kill during the attack. He consistently stated that he did not want to kill "innocent civilians" or "women and children," but rather he targeted U.S. military employees and recruits at the MEPS. Moreover, he specifically planned the attack so that he would kill as many of these victims as possible, and he was enthusiastic about the opportunity to kill them. This was something Abdul-Latif regularly discussed:

---

[1] The cited excerpts from the transcripts are collected in Exhibit A, which is marked with page numbers at the bottom of each page.

- In response to Childs's statement that Abdul-Latif needed to be the one to "develop the goal" of the attack, Abdul-Latif stated, "The goal is to kill every single, uh-uh soldier in there, and-and every recruit in there. That's what it is." Ex. A at 12-13.

- After conducting surveillance with Childs at the Federal Center South building, including viewing the security guard in the lobby, Abdul-Latif stated: "I mean – that, that guard, it don't matter if he's armed. We'll just kill him right away. . . . It don't matter what guard it is. We – we kill him first. 'Cause the guard, he, he has a – there's the highest risk of him having a weapon." Ex. A at 14-15.

- Abdul-Latif to Childs: "I need to call MEPS again, because I-I want, I also want to find out what days the recruits are coming there, whether it's every day or whether it's a certain day. 'Cause we want to come there on a day where-where all the recruits are processing. . . . It's very important. Because I don't want to come there just to kill an old guard. . . . You know, I'm trying to make a point with the –" Ex. A at 16-17.

- Abdul-Latif to Mujahidh/Childs: "And [] the thing is, on Monday and Tuesdays those are the main days that they do full processing for soldiers to get ready to go to boot camp. So, if we do something like this, it's gonna be on a Monday or a Tuesday. No other day than that. We're not going there just to kill the security guards. There's no sense in that." Ex. A at 18-19.

**2.    Evidence Confirming that the Attack Plot was Abdul-Latif's Idea.**

Notwithstanding his guilty pleas, Abdul-Latif continues to claim that the attack plan was originated by Childs, and not him. He now claims that this was first raised by Childs on May 30, 2011. However, the actual evidence in the case – including Abdul-Latif's own statements – makes clear that he was the originator of the planned attack, and that he presented the idea to Mujahidh initially, and then later to Childs.

For example, on June 10, 2011, Abdul-Latif and Childs had the following exchange about how the plot was initially developed:

Childs:        How did you approach him [Mujahidh] without, uh, him tweaking out on you?

Abdul-Latif:  Man, me and him, we been friends for a long time. We talk a lot about it.

Childs:        So this is something that, uh, has been in-in, uh in the works?

Abdul-Latif:  *This has been in discussion off and on for a while, you know?* You know, and –

Childs:        And he's a hundred percent down? You don't – You have, you have no doubts about him?

Abdul-Latif: I have no – I have no doubts about him.  I mean, you know, he's exactly [] the type of person we need.  He's crazy.  He doesn't have any, uh – anything holding him up, kind of like I do with a family.  You know what I'm saying.  He's willing to just drop everything and come up here.

Ex. A at 20-22 (emphasis added).  This conversation would never have taken place if – as Abdul-Latif now claims – Childs had been the one to first present the idea to him less than two weeks earlier on May 30, 2011.

Similarly, on June 8, 2011, Childs and Abdul-Latif discussed the evolution of Abdul-Latif's attack plan, and specifically, the fact that Abdul-Latif changed the target from Joint Base Lewis-McChord to the MEPS.  During this discussion, Childs stated, "[T]he only reason I said that is *'cause when you first brought it up* it was Lewis, then it flipped to McChord, then it flipped to MEPS, and so I was saying let's stick – let's stick with this one."  Ex. A at 23-24 (emphasis added).  Abdul-Latif never denied that he was the one who "first brought it up."  In fact, throughout the countless hours of audio recordings in this investigation, Abdul-Latif never makes a statement suggesting that it was Childs who first brought up the attack plan.  The absence of that evidence speaks volumes.

Mujahdih also confirmed that Abdul-Latif had propositioned him to participate in the attack.  In response to Child's question asking who came up with the original attack plan, Mujahidh stated, "Abdul called me and let me know what was going on.  Asked me to join him.  I told him yeah."  Ex. A at 25-27.  This is also corroborated by telephone records obtained during the course of the investigation.  These records reveal that between March 19, 2011, and May 28, 2011, Abdul-Latif and Mujahidh spoke over the telephone on more than twenty occasions, often for longer than ten minutes.  There were no telephone contacts between Childs and Mujahidh prior to June 2011, and it is clear from the recorded conversations that Childs had never met Mujahidh before the events in this case, and that they had never discussed the plot.

GOVERNMENT'S SENTENCING MEMORANDUM - 8
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

In addition to the above evidence, an email exchange between Abdul-Latif and another person in early May 2011 independently confirms that Abdul-Latif was, on his own, seeking out opportunities to engage in violent "jihad" prior to his discussions with Childs.  On May 4, 2011, Abdul-Latif received an email from a person who expressed their views on Osama Bin Laden, stating that they had considered Bin Laden a worthy leader during the late 1980's, but that they were "disappointed" with Bin Laden's "decision to blow-up the towers," referring to the attacks on September 11, 2001.  That same day, Abdul-Latif wrote in response:

> I look at OBL [Bin Laden] as a pioneer of Jihad and hope InshAllah to somehow be blessed to join the Mujahideen in this life and the Hereafter InshAllah it'll happen.  Like I said to you before, I am one of the real Muslims and will give everything even my life for Allah, I am not just running my mouth.  I fear no one but Allah so just let me know whatever I can do to support the Mujahideen and Islam.

The next day, on May 5, 2011, this person wrote back in an apparent effort to talk Abdul-Latif out of pursuing a violent course of action.  Among other things, this person wrote:

> I have read the words you've said.  You've stated your intentions very clearly.  But do you truly grasp the commitment relayed in your message?  Jihad is not part time, it is not half-hearted and it is not conditional.  It means the willingness to die – anywhere and any place. . . .  What about your family?  Your children? . . .  So, are you truly willing to trade the next breath you breathe for the next life?  That breath may be more tortuous than you can possibly conceive.

On May 6, 2011, Abdul-Latif re-confirmed his commitment to a violent course of action:

> Being trapped in the Hood on the west coast my whole life, I want to see what else is out there that could make me successful, but now I know I can in a way that pleases Allah S.W.T.  Sister, *if you know a way that I can do this that you can't explain except in person, then let me know and I will come to you and discuss on my dollar.*  Or if it is work with you, then let me know too. . . .

On June 5, 2011, Abdul-Latif wrote this same person and made clear that he had found a way to pursue his "jihad":

> I have made Istikharrah [prayer] about that issue and many other things as well.  *Allah S.W.T. has provided me with what I need to complete the tasks that are ahead in my life* without me being disappointed just like we are

1    promised in making Istikharrah. . . .

2        The timing of these emails, coupled with the above-referenced recordings and

3    other evidence in the case, demonstrates that Abdul-Latif had been seeking out

4    opportunities to engage in violent "jihad," and that he developed the attack plot.

5            **3.      Abdul-Latif's Enthusiasm For and Commitment to the Attack.**

6        Abdul-Latif's statements over the course of the recordings make clear that he was

7    committed to his attack plan and was prepared to die as a perceived martyr during the

8    attack.  Although there was substantial discussion about the possibility/hope of escaping

9    after the attack was carried out, Abdul-Latif made clear that he was willing to die in the

10    attack, based on both his words and actions.  Throughout the recordings, Abdul-Latif

11    often discussed his desire to die a "shaheed" (martyr) and for "Allah to bring [him] to the

12    mujahedeen, Ishalallah for jihad."  In one telephone conversation, Wali Mujahidh

13    commented that he was watching the show *Lockup* on MSNBC and, "That's gonna be us,

14    huh?  We gonna be in lockup."  Abdul-Latif replied, "We'll probably be in our grave,

15    bro."  Mujahidh answered, "Yeah.  One or the other."  Abdul-Latif stated: "Well, hope

16    you're looking forward to it."  Ex. A at 28-29.

17        This was not just idle talk by Abdul-Latif.  He also began to make plans for his

18    family after he was gone.  He discussed his plan to have a friend and/or his brother-in-law

19    run his janitorial services business so that it would remain in place for his son to take over

20    in the future.  He repeatedly discussed his concern that his wife needed to learn to drive

21    so that she could take care of herself when he was gone.  On the recordings, there are

22    numerous instances when Abdul-Latif instructed his wife to pay an old traffic fine so she

23    would be eligible to obtain a learner's drivers permit, and he repeatedly asked Childs to

24    teach his wife how to drive before the attack.  Perhaps Abdul-Latif put it best himself

25    when, on June 21, 2011, one day prior to his arrest, he commented that, "because of what

26    we're doing now, I'm kind of beginning to cut my ties with people."

27        Abdul-Latif further demonstrated his true commitment to the attack by declining –

28    and even mocking – opportunities that were provided for him to back out of the attack

plan. During one conversation, Childs stated, "I want to make sure that you, this is what you're down for. . . . Do you want to – do you want to go in here, and do you want to do this as you were saying? Or do you want to – do you want to call it off? Or, you know, I'm not gonna hold it against you." Abdul-Latif responded by saying that he wanted to "proceed as planned," unless "anything serious happens, like, you know, if we know the FBI's watching us. . ." Ex. A at 30-32.

Similarly, the day before Abdul-Latif was arrested, Childs provided both Abdul-Latif and Mujahidh with an opportunity to withdraw from the conspiracy: "You know, if either of one – if either one of you brothers want to step out now, back away. It's okay. I won't hold it against you, okay." Abdul-Latif mockingly replied (while laughing), "We're not doing this for you. Good lord!" He also emphasized his commitment to the plan by reminding Childs that, "I gave you all my money, man, for this thing, man. What you think?" Ex. A at 33-35.

The significance of Abdul-Latif's financial commitment to the attack plan cannot be overstated. He literally put his money where his mouth was. Abdul-Latif was a man of very limited financial means at the time of the offense: he had a bankruptcy petition pending in the federal courthouse; his personal and business bank statements often had end-of-month balances of less than one dollar; his income was approximately $2,000 per month; and he had a no cash horde other than the $300 that was discovered by the FBI during the search of his residence.

As the investigation unfolded, it became clear that the true test of whether Abdul-Latif's plot was real, as opposed to "just talk," was whether he would be willing to spend a significant sum of money to purchase the weapons he said he wanted to acquire. He had every opportunity to back out of the plot by claiming not to have enough cash to buy the weapons. Instead, on June 16 and 17, 2011, Abdul-Latif provided Childs with $800 cash for the purchase of machineguns and grenades for use during the attack. In addition, he paid for a portion of Mujahidh's bus ticket from Los Angeles to Seattle, ensuring that Mujahidh would be available to train for and carry out the attack.

GOVERNMENT'S SENTENCING MEMORANDUM - 11
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

Given his financial situation, it was not easy for Abdul-Latif to come up with this money, and how he did so speaks volumes about the seriousness of his commitment to carry out the attack. Abdul-Latif told Childs that he had been saving money to participate in the *hajj*, an annual religious pilgrimage to Mecca. To this end, Abdul-Latif had been paying cash installments to a travel agent who collects money and arranges *hajj* trips for local community members. Abdul-Latif withdrew this *hajj* money and instead used it to purchase weapons for his attack plan. Simply put, Abdul-Latif put his plot before what he claims is the most important thing in his life – being an observant and devout Muslim. He made this known to both Mujahidh and Childs, in order to emphasize his commitment to the plot. For example, during a phone conversation with Mujahidh, Abdul-Latif stated, "Put your trust in Allah, man, that's all I can tell you. . . . I had a whole bunch of money saved for *hajj* and I just put it all into this project, man, so I ain't got no money either. I put a lot of faith in that too, man." Ex. A at 36-38. Similarly, he told Childs: "I had $800 with the brother [travel agent]. I put down money for *hajj*, and I'm not gonna make it there, you know what I'm saying? I'm cool with that." Ex. A at 39-40.[2] When he delivered the money to Childs, Abdul-Latif stated, "I just took out my money I was gonna use for hajj." Ex. A at 41-42.

### 4. Evidence of Abdul-Latif's Planning and Preparation for the Attack.

The defense attempts to portray Abdul-Latif as someone who was "a passive contributor to the plot, did little research for the attack, and took no independent action to more the scheme forward." Salusky report at 24. This statement simply ignores the evidence of the case. Time and time again, Abdul-Latif took an active role in planning the attack – often directing the other participants – and he took many actions for the purpose of making his planned attack become a reality. Some of the most notable examples include:

---

[2] Abdul-Latif's comment that, "I'm not gonna make it there [*hajj*]," is further evidence that he anticipated the likelihood that he would not survive the planned attack.

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

- Abdul-Latif originated the attack plot and recruited both Mujahidh and Childs into the plan (as discussed above).

- Abdul-Latif unilaterally changed the target of the attack from Fort Lewis to the MEPS. The fact that he did this on his own is uncontroverted, because it takes place on one of the earliest recordings. On June 6, 2011, Abdul-Latif and Childs were at Abdul-Latif's residence discussing the attack on Fort Lewis and conducting internet research about the base. Out of the blue, Abdul-Latif states, "What about this? . . . What about hitting a MEPS [] office?" Childs, never having served in the military, was not familiar with a MEPS and responds, "A what?" Abdul-Latif then goes on to state that he had previously processed through a MEPS office, and explains in detail what takes place at a MEPS. Abdul-Latif also lays out the significant tactical advantage that the MEPS presents as a soft target: "You know, it's a confined space. Not a lot of people carrying weapons, and we would have an advantage." Based on internet research, Abdul-Latif initially concluded (incorrectly) that the MEPS was located in downtown Seattle on Third Avenue. Ex. A at 43-48

- Immediately after the above conversation, Abdul-Latif conducted research on his own to locate the MEPS. Telephone records reveal that after Childs had departed his residence, Abdul-Latif called the Seattle MEPS office from his cell phone at 11:06 p.m., 12:07 a.m., and again on the following morning (June 7th) at 8:42 a.m. Later on June 7th, Abdul-Latif sent text messages to Childs confirming that he had located the MEPS. Abdul-Latif wrote, "Just found out actual local of target not what we thought." Childs replied, "Meaning what?" Abdul-Latif responded, "That means that is not downtown it is on e marginal way just lettin u know brow." Abdul-Latif had correctly located the MEPS on East Marginal Way.

- Forensic examination of Abdul-Latif's laptop computer revealed that he used the computer for a variety of things related to the attack plot. There were Yahoo! and Google searches on the computer using the terms "mcchord afb map," "us military processing station," "Fort Lewis Military Base," and "MEPS Seattle." In addition, the computer had been used to visit the internet websites of militarybases.com, www.mepcom.army.mil, www.lewis.army.mil, armybases.us, gunsamerica.com, info.lewis-mcchord.army.mil, and www.gunsamerica.com. Some of these computer searches were conducted on dates and times when Abdul-Latif was not with Childs, confirming that he was conducting this research independently. Moreover, some of this activity pre-dates May 30, 2011, the date on which Abdul-Latif now claims Childs hatched the plot. For example, on April 17, 2011, Abdul-Latif's computer visited the internet sites www.mepcom.army.mil and armybases.us; and on April 16, 2011, the computer was used to access www.gunsamerica.com.

- On June 6, 2011, Abdul-Latif suggested to Childs that they should scout out the MEPS building in person. On June 7, 2011, Abdul-Latif directed Childs to go "undercover" into the building: "I was thinking a little, a little bit about this today. We need to get inside that building. So I would – *so the idea I had* was for you to kind of go undercover. Just dress like this. Take the kufi off, go in there, and see what the first floor looks like . . . and then you, then you can come out. And we can draw like a little map of what it might look like." Ex. A at 49-52 (emphasis added). The next day, on June 8th, Abdul-Latif and Childs followed-up on Abdul-Latif's idea and

1        conducted physical surveillance at the Federal Center South building.

2    •    On June 9th, Abdul-Latif raised concerns about the video surveillance
         cameras that he noticed at the Federal Center South building the day before.
3        In discussing this issue with Childs, Abdul-Latif displayed lucid planning
         around, and thoughtful consideration of, the impact of the security cameras
4        and video surveillance equipment. He stated, "I was thinking a little bit
         today. And, uh, the thing is – the thing is, well, we don't have the element
5        of surprise. You know, and we need to find a way to get that." To solve
         this problem, Abdul-Latif instructed Childs to go into the Federal Center
6        South building and speak to the security guards, as a pre-text to examine the
         security video feed they receive and to see whether the guards were armed.
7        Ex. A at 53-56. Later that same day, Abdul-Latif had a similar conversation
         with Mujahidh over the telephone, again expressing his concern about the
8        cameras and the need to "find a way around that."

9    •    Abdul-Latif provided instructions to Childs regarding the acquisition of
         weapons to use during the attack. For example, on June 6th he instructed
10       Childs to contact his weapons source to "get the exact price down to the
         number." On June 8th, he instructed Childs to purchase three machineguns,
11       magazines and ammunition, and grenades for use during the attack. After
         providing Childs with the $800 cash to purchase the weapons, Abdul-Latif
12       directed: "[A]s soon as you get the clips in your hand, you need to call me
         right away. We need to hook up right away. . . . You know what I'm
13       saying? Don't go to the store. Don't get gas. Don't do anything. Call me.
         . . . Don't even – don't do anything. Just come see me." Ex. A at 57-59.

14

15   •    As noted above, Abdul-Latif insisted that the attack be committed at time
         when the maximum number of military recruits would be present at the
16       MEPS. From discussions with Childs, and through his own research,
         Abdul-Latif came to believe that Monday and Tuesday mornings were the
17       times when the most recruits would be present. Thereafter, he insisted that
         the attack be carried out on one of those mornings.

18   •    Using the hand-drawn map that he instructed Childs to make after going
         "undercover" at the Federal Center South building, Abdul-Latif repeatedly
19       strategized about the attack, often gaming out play-by-play movements that
         the attackers would employ. There are many examples of these types of
20       discussions, including on June 10, 2011, when he and Childs first reviewed
         the map together (Ex. A at 60-68), and on June 21, 2011, when he reviewed
21       the attack plan with both Mujahidh and Childs (Ex. A at 69-76). These
         portions of the conversations are attached for the Court's review, and are
22       revealing of Abdul-Latif's enthusiasm for the attack plot and his active
         participation therein. These conversations make clear that Abdul-Latif was
23       contributing heavily to the planning of the attack, down to the exact
         locations where each attacker would be stationed and where and how
24       grenades would be deployed. For example, during the June 21st
         conversation, Abdul-Latif stated: "We come up in here . . . we throw the
25       grenade in there. . . . Move up, throw the grenade in here. . . . Have one
         of us wait on the corner . . . the other two keep going. . . . When you get
26       here, we drop the grenade here. You get halfway down the hallway, we
         drop the grenade down here. We can throw one in the bathroom, too. . ."

27

28

GOVERNMENT'S SENTENCING MEMORANDUM - 14
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1

- Abdul-Latif gave other directives to his fellow attackers, indicative of his
2  active participation in the plan and his careful thought about its
   consequences. For example, on June 21, 2011, he instructed Mujahidh and
3  Childs not to speak to law enforcement if they got caught: "[I]f we don't get
   killed and we get arrested, don't ever say anything to the police. 'Cause
   they gonna tell you, 'Oh, you'll feel better. Oh, we can cut you a deal. Oh.'
4  Don't say anything. Because they're gonna kill us anyway."

5

- Throughout the planning of the attack, Abdul-Latif was conscious of
6  various operational security measures. For example, Abdul-Latif instructed
   Mujahidh to wait to discuss the specific details of the attack until he arrived
7  in Seattle, so as not to speak too much over the telephone; he suggested to
   Childs that they should use gloves when handling firearms; and in the
8  moments prior to his arrest, he instructed Mujahidh not to take photos of
   them posing with the machineguns they had just purchased, explaining that
   "a group of Muslims" who planned to attack Fort Dix had been caught by
9  the FBI because they prepared a similar DVD documenting their training.

10      The defense tends to gloss over the above-referenced evidence, and is quick to

11  point out the portions of the recordings during which Childs is most vocal and active. It

12  is inevitable, during any long-term covert investigation using a confidential informant or

13  an undercover agent who poses as a "participant" in a criminal conspiracy, that the law

14  enforcement operative must be involved, to some extent, in "planning" the crime. Acting

15  in this manner is the only way for the operative to maintain his/her cover. To that end,

16  Childs was, indeed, a full participant in the discussions with both Abdul-Latif and

17  Mujahidh. However, it is simply a gross mischaracterization of the evidence to portray

18  Abdul-Latif as anything but an enthusiastic, active, engaged, thoughtful participant and

19  lead planner of the attack.

20      Similarly, the fact that the government's investigation provided Abdul-Latif with

21  the opportunity to pursue his conspiracy in no way diminishes the seriousness of his

22  intent, or his commitment to follow through with the attack. The evidence indicates that

23  beginning in at least early May 2011 – and likely even earlier – Abdul-Latif was seeking

24  out ways to engage in violent "jihad." After Childs reported Abdul-Latif's plot to law

25  enforcement, the government's investigation simply provided Abdul-Latif with his first

26  realistic opportunity to acquire the weapons he needed to pursue his conspiracy.

27  //

28  //

### 5.    The Would-Be Victims of Abdul-Latif's Attack Plot.

Abdul-Latif was very clear about who his intended victims were – the military officers and employees who worked at the MEPS, the high school age recruits ("as many as possible") who were present at the MEPS for processing, and the Federal Protective Services security guards who were working at the Federal Center South building.

The Seattle MEPS is the central processing point in Western Washington for recruits who seek to enter any branch of the U.S. military.  As such, it is a busy place. The MEPS has provided data regarding the number of recruits who were present there during the 90 days following Abdul-Latif's arrest.[3]  Mondays and Tuesdays are the days of the week when the most recruits process at the MEPS.[4]  On Mondays, an average of 83 recruits were present.  On Tuesdays, the average number of recruits was 82.  There are also a substantial number of active duty and civilian military employees who work at the Seattle MEPS.  On a typical day, there are approximately 60 employees working at the MEPS (comprised of 34 full-time staff, 20 service liaisons from the various branches of the U.S. military, and 5-10 contract employees).

Although Abdul-Latif's plot was designed to kill these military employees and recruits, it was also readily foreseeable to him that many others would die during the attack.  There were at least two categories of non-military victims that must have been foreseeable to Abdul-Latif: (a) family members of recruits who were present at the MEPS; and (b) other federal employees who worked at the Federal Center South building.

Successful military applicants take the oath of service at the MEPS, and they are shipped directly to basic training thereafter.  The MEPS has a formal ceremony room wherein successful recruits take the oath of service.  Parents, siblings, and other family members of recruits are invited to attend the ceremony, and many families take advantage

---

[3]  The information in this paragraph was provided by the leadership command of the Seattle MEPS during interviews with law enforcement.

[4]  As noted above, having learned this, Abdul-Latif insisted that the attack be carried out on a Monday or Tuesday.

of this opportunity. According to the data provided by the MEPS, an average of 20 or more family members are present on a Monday or Tuesday morning. There is a family waiting area centrally located within the MEPS, including a play room for children containing toys and books. If Abdul-Latif and Mujahidh had carried out their planned attack using machineguns and grenades, it is likely that everyone present in the waiting area (and the play room) would have been massacred. Abdul-Latif himself processed through a MEPS in San Diego, California, prior to his brief service in the U.S. Navy. Therefore, he must have known that family members of recruits were likely to be present at the MEPS.

Abdul-Latif's internet research and physical surveillance of the Federal Center South building, as well as his discussions with Childs, also made clear to him that there were many other offices inside the enormous Federal Center South building besides the MEPS. Abdul-Latif contemplated throwing grenades into the building's cafeteria and down the large hallways to dissuade anyone from wanting to "be a hero" during the attack. There is no question that many non-military victims would have been killed. Nearly all of these victims would have been federal employees working at the many other federal agencies and offices that are housed at the Federal Center South building.

Abdul-Latif's planned attack also likely would have resulted in the death of many children. Although this may not have been an intended consequence of Abdul-Latif's plan – he consistently stated that he did not want to kill "women and children" – it would have been the result nonetheless. That is because one of the tenants at the Federal Center South building is a federal child care center. This child care center is located in the space immediately adjacent to the MEPS. The specific existence of the childcare center, and the details regarding its location relative to the MEPS, may or may not have been known to Abdul-Latif. However, he was certainly aware of the likelihood that a child care center was located somewhere in the building. This is made clear through a recording on June 8, 2011, when Abdul-Latif and Childs conducted physical surveillance at the Federal Center South building. As they drove by the front of the building along E. Marginal Way,

1    Abdul-Latif noticed the playground that is plainly visible from the street, and commented,

2    "We got a playground here, too?"  Childs responded, "I wonder – I don't think the whole

3    building belongs to them [MEPS], then.  It's probably just that front portion."  Ex. A at

4    77-79.  They then proceeded to make a U-turn through the rear parking lot of the

5    building, within ten or twenty feet of the playground.  This playground happens to be

6    located immediately outside of the window of the MEPS Battalion Commander's office, a

7    location that Abdul-Latif had specifically targeted for the attack.[5]  Any attack carried out

8    on the Commander's office – especially one using machineguns and grenades – would

9    have sprayed bullets and/or shrapnel all over the playground, as well as through the walls

10   and into the childcare center itself.

11          **B.       History and Characteristics of the Defendant.**

12                  **1.       Evidence of Abdul-Latif's Pre-Existing Radical and Violent Ideology.**

13          The defense focuses heavily on arguments that Abdul-Latif was entrapped into his

14   criminal conduct by Childs, that he was heavily influenced by a domineering Childs, and

15   that he was not motivated to actually carry out the attack, but rather, just to talk and

16   fantasize about it.  These defense arguments raise an important aspect of the defendant's

17   background and characteristics – his long-standing radical and violent ideology that was

18   in place long before the events of this case began.  It is well-documented that Abdul-Latif

19   has held these radical and violent beliefs since before the offense conduct in this case.

20   This evidence is found in many forms.

21

22          [5]  Abdul-Latif repeatedly emphasized his desire to attack the Commander's office.
     After Childs explained that the Commander was the highest ranking official at the MEPS,
23   Abdul-Latif responded: "Man, wow.  He'd have to be some – he'd have to be somebody
     that'd be a main target for us. . . .  And he's somebody, man, that would get the attention
24   of the kuffar."  Ex. A at 80-82.  From that point on, Abdul-Latif consistently discussed his
     desire to attack the Commander's office, especially while he strategized about the
25   logistics of the attack using the hand drawn map of the building.  For example, on June
     14, 2011, Abdul-Latif stated, "I'm watching the Commander's office.  I'm watching
26   this."  On June 21, 2011, Abdul-Latif reaffirmed, "I'm gonna come right here toward the
     Commander's office and guard him, so I'll be guarding the hallways over here."  Later in
27   the same conversation, he declared, "We're gonna hit the Commander."  On June 10,
     2011, Abdul-Latif stated, "[W]e could take care of the Commander.  Maybe we could toss
28   a grenade down toward his door and it'd just blow off."  Ex. A at 24.

GOVERNMENT'S SENTENCING MEMORANDUM - 18
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

*a. You Tube video comments.*

Abdul-Latif maintained a You Tube channel, though which he regularly viewed radical videos and posted comments in response to these videos. Abdul-Latif's comments reveal that he was extremely angry with the United States over the actions taken by the U.S. military overseas, and that he advocated a violent response. Abdul-Latif made all of these comments prior to May 30, 2011. Among other things, Abdul-Latif posted the following comments on the dates listed: May 16, 2011 ("these 'kill team' kafirs will pay for their attacks on these people now and on the 'Day of Judgment.' We will get payback."); May 6, 2011 ("america never helped anyone in Islam, they just helped themselves to Islamic lands killing, torturing, raping, and usurping Islamic people and lands, search '[U.S.] kill team' and you will see your so called heroes in action, and then you talk to us about what is justified. The Mujahadeen have my love, du'a, and support without fear of reprisal. . ."); May 1, 2011 ("As far as OBL [Osama Bin Laden][6], InshAlla, he will be martyred and his sacrifice will be accepted by Allah S.W.T. as a pioneer for jihad."); November 9, 2010 ("How can we just accept america and their allies attacking our Muslim Ummah this way and most of us don't even bother to say anything, or organize to help our brothers and Sister on the battlefield. I like many Muslims are calling all Muslims to rise up and defend Islam at all costs. If this doesn't cause us to wake up, then nothing will!!!"); August 4, 2010 ("May Allah . . . punish every american soldier and everyone who has anything to do with these crimes against the Muslims in there lands. May Allah execute every u.s. militant and everyone working with them on this murderous mission against Islam."); July 14, 2010 ("Hey Muslims!!!!!!!!!!!!! The 911 was a setup by the American government, there are plenty of evidences that show that Muslims are innocent of this accusation . . . [M]ay Allah bless OBL and all Muslims who have the courage in american lands to speak the truth, and perform the jihad against the

---

[6] Abdul-Latif provided the term "OBL" as the "pick-up password" on the Greyhound website when he purchased Mujahidh's bus ticket from Los Angeles to Seattle.

1  yahoodi – the american terrorist government.").

2               b.      You Tube channel and video postings.

3         Abdul-Latif also used his You Tube channel to post videos of himself ranting

4  about a variety of topics, often involving his hostility to America and the U.S. military's

5  activities abroad.  The FBI downloaded a copy of Abdul-Latif's You Tube page on May

6  6, 2011, more than three weeks before Abdul-Latif claims Childs first raised the attack

7  plot.

8         In one video, entitled "Advice for the Ummah," Abdul-Latif complains that

9  President Obama has made war against Islam by putting "a hit" on the notorious terrorist

10  leader, Anwar Al-Awlaki.  Abdul-Latif encourages others to "help the religion any way

11  you can" including through "jihad," which he describes with words to the effect, "Jihad is

12  not just slaughtering people – that's terrorism.  It is the defense of the religion physically

13  and spiritually."

14        On May 1, 2011, Abdul-Latif posted a video entitled, "Envy of the Kuffar," during

15  which he accuses the U.S. military "kaffirs" of murdering Muslims and "invading our

16  lands," he states that he wants to establish "jihad with the tongue, with the heart, and with

17  the hand" and that Muslims should support the mujahideen "in any way we can," and he

18  declares: "We must establish jihad.  I don't care what anyone has to say about that.  You

19  can turn me into the FBI or whatever."

20        In another video, entitled "Muslims, Don't Be Fooled," Abdul-Latif urged others

21  to "sacrifice everything, even our life.  I'm not just running my mouth."  Similarly, in a

22  video he called "The Need to Be Unified," Abdul-Latif again insisted that the "kaffirs"

23  were "invading Islamic countries and raping and murdering Muslims," and stated that,

24  "We need to stand up with sword, tongue, and hate in our hearts . . . We cannot sit back

25  while Muslim lands are invaded."[7]

26  _____

27        [7]  Abdul-Latif's deep-felt commitment to radical causes and beliefs was further
      confirmed by his possession of numerous items that were seized by the FBI during the
28  search of his residence, including several DVDs containing the propaganda of Anwar Al-
      Awlaki.

### 2.    Evidence Concerning Abdul-Latif's Mental Health.

As the Court knows, Abdul-Latif has been evaluated by several forensic psychologists and other mental health professionals.  This process appears to have culminated in the recently-produced report authored by defense expert Sheppard Salusky, Ph. D., PLLC.[8]  This report makes a variety of claims that are simply laughable in the face of the actual evidence in the case, such as:

- "It is noteworthy that Mr. Abdul-Latif was a passive contributor to the plot, did little research for the attack, and took no independent action to move the scheme forward." (page 24)
- "This probably reflects how [Abdul-Latif] thinks about the entire plot – a fantasy much like paint ball or a role play." (pages 24-25)
- "His psychological condition left him vulnerable to pressure from the others to remain part of the plot." (page 26)
- "Mr. Abdul-Latif also explained he felt trapped and obligated.  'I would have felt better saying no if Walli said no.'" (page 26)
- "Put simply, Mr. Abdul-Latif's explanation for continuing with the plot makes little logical sense." (page 26)

The Salusky report is premised on information and claims provided by Abdul-Latif; the report readily accepts all of this information as true without much inquiry.  For example, Abdul-Latif claims that Childs (not himself) came up with the attack plot on May 30, 2011.  Dr. Salusky accepts this as true with little more than the conclusory statement, "Though one might consider this version of events self-serving, it is consistent with the available information" (page 12), followed by no further supporting analysis.

---

[8] The government had been operating with the understanding that – as sanctioned by the Court – the expert witnesses for both parties would *not* present information or evidence specifically related to Abdul-Latif's offense conduct.  *See* Doc. 137 (Stipulated Order that the government's experts shall not question the defendant about offense conduct, and that "at trial" the defense experts shall not present testimony regarding offense conduct).  On March 12, 2013, just one week prior to the due date for sentencing memoranda, the defense for the first time provided Doctor Salusky's 33-page report, which goes to great lengths to discuss the offense conduct based on interviews of Abdul-Latif.  The defense first advised the government that Abdul-Latif had been interviewed about the offense conduct by an email sent at 4:15 p.m. on March 7, 2013, but the report was not produced until March 12, 2013.

The government does not seek to transform the sentencing hearing in this matter into a "battle of the experts," which would detract from the proper focus of the hearing. Suffice it to say, however, that there have been an evolving list of diagnoses prepared by the defense experts, some of which have been flatly contradicted by the government's experts.

For example, the defense experts initially diagnosed Abdul-Latif as suffering from Partial Fetal Alcohol Syndrome ("FASD"). The government experts flatly ruled out the presence of FASD based on concrete evidence such as the lack of measurable facial features that are required to be present for such a diagnosis. In response, the defense experts have now modified their diagnosis to something referred to as, "Alcohol-related Neurodevelopmental Disorder (ARND)," which they say falls under the general umbrella of FASD.

Similarly, whereas the defense experts originally diagnosed Abdul-Latif as having "Personality Disorder Not Otherwise Specified with Dependent Personality Traits, Histrionic Personality Traits, Self-Defeating Personality Features, and Negativistic Personality Features," after the government's forensic psychologist found little, if any, supporting evidence for this diagnosis, the defense reports have modified the diagnosis to simply reflect, "Dependent Personality Disorder."

There continues to be a disagreement between the parties' respective forensic psychologists as to whether Abdul-Latif suffers from Posttraumatic Stress Disorder. The government's expert found no evidence of PTSD, and this is simply explained away by Dr. Salusky with: "Mr. Abdul-Latif's cognitive impairments may have interfered with his ability to apply the questions asked by [the government's expert] Dr. Muscatel to the particular events in his life. In addition, Mr. Abdul-Latif may not have been sufficiently comfortable with Dr. Muscatel to reveal adequate detail." (page 16)

With respect to the other opinions of the parties' forensic psychologists, whereas the defense portrays Abdul-Latif as entirely dependent and therefore preyed-upon by the government's informant in this case, the government's expert did not find the defendant

GOVERNMENT'S SENTENCING MEMORANDUM - 22
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

to be a particularly dependent person, and to the extent there were cognitive deficiencies detected, their perceived impact was relatively mild as compared to the over-the-top descriptions provided by Dr. Salusky.

But regardless of whether the Court believes (a) that Abdul-Latif suffers from serious cognitive and/or mental health deficiencies, and that those issues contributed heavily to the offense conduct, or (b) that the defense experts are significantly overstating the presence and/or impact of mental health issues in this case, any weight that the mental health evidence should be given in terms of mitigating the sentence has already been accommodated by the terms of the plea agreement. The Sentencing Guidelines call for a "life" sentence. Abdul-Latif was charged with two counts that carried a 30-year mandatory minimum sentence (Counts 4 and 6 – Possession of Machineguns in Furtherance of a Crime of Violence), both of which will be dismissed by the government as part of the plea agreement. Plea Agreement ¶ 11. A sentence of 19 years, at the high end of the sentencing range provided for in the plea agreement, is already substantially lower than the sentences the defendant would otherwise have faced. The mental health evidence in this case is not of a kind that justifies any further mitigation of the sentence.

**C.    Need for the Sentence to Reflect the Seriousness of the Offense, to Provide Just Punishment, to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant.**

A lengthy prison term is required in this case to reflect the extremely serious offenses of conviction, and to provide just punishment for these crimes. As far as inchoate crimes go, it is difficult to fathom more serious crimes than these.

The Court's sentence in this case should also be long enough to send a strong deterrent message to other individuals who share Abdul-Latif's radical views and who may consider acting on them. As will be discussed below, this case unfortunately does not stand alone. Over the past few years, there have been many similar cases across the United States in which similar plots have been carried out, attempted, and/or disrupted by the FBI and other law enforcement agencies. As was the case with Abdul-Latif, these other defendants often were inspired by the radical rhetoric of Osama Bin Laden, Anwar

GOVERNMENT'S SENTENCING MEMORANDUM - 23
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

al-Awlaki, and other terrorist figures. It is foreseeable that there will be others who attempt similar plots in the future. Indeed, part of Abdul-Latif's goal was to inspire others to commit similar attacks, just as he claimed to be inspired by Nidal Hissan's deadly attack at Fort Hood.[9] The Court should send a strong deterrent message – by imposing a 19-year prison term – in order to dissuade any future attack plots.

A 19-year term of imprisonment is also necessary to protect the public from future crimes by Abdul-Latif. There is every reason to believe that he is a future danger to the community. Abdul-Latif undertook his plot in furtherance of his long-standing and deeply felt radical beliefs. To this day, he has not disavowed the radical ideology that inspired his attack plot, nor has he expressed any meaningful remorse for his conduct, either to the Probation Office, the Court, or to the various mental health professionals who have examined and interviewed him. Based on the evidence in this case, the Court should expect Abdul-Latif to emerge from prison with the same radical and violent ideologies that led him to plan the mass killing at the MEPS. A 19-year sentence would best protect the public from Abdul-Latif's potential future crimes. For the same reasons, the government urges the Court to impose a life term of supervised release, to ensure that the Probation Office will always have a mechanism in place to monitor Abdul-Latif's activities.

### D.    Need to Avoid Unwarranted Sentence Disparities.

Over the last few years there have been numerous prosecutions throughout the United States involving attempted and/or disrupted terrorist attacks in the homeland. Many of these cases involved the use of undercover law enforcement agents and/or confidential informants, and are commonly referred to as "sting" cases. The facts of these cases are widely varied, and so are the sentences imposed by the courts. The government has reviewed many of these cases in preparation for the sentencing in this case. As a

---

[9]   As noted above, Abdul-Latif stated: "Imagine how many young Muslims, after this, if we're successful at it, will try to hit these kinds of centers. Imagine how fearful America will be."

general matter, the sentences imposed on the lead defendants in these other cases range from 30 years down towards 10 years, with the majority of the sentences falling somewhere between 20 and 30 years.  *See United States v. El-Khalifi*, 1:12-CR-37 (EDVA) (30 years); *United States v. Finton* 09-CR-30098 (SDIL) (28 years); *United States v. Martinez*, JFM-10-0798 (D. MD) (25 years); *United States v. Cromite* 09-558 (SDNY) (25 years); *United States v. Smadi* 3:09-CR-294 (NDTX) (24 years); *United States v. Farooque Ahmed* CR10-414 (EDVA) (23 years); *United States v. Amawi*, CR06-719 (20 years); *United States v. Ferdaus* CR11-10331 (D. MA) (17 years); *United States v. Douglas Wright* 1:12CR238 (NDOH) (11.5 years).  In a few instances, the lowest level defendants in these cases were sentenced to slightly less than 10 years.

Some of these cases have aspects to them that may be considered more aggravating than the instant case.  For example, in many of the cases the defendants went further with their attack plans, some actually pressing a detonator that they believed would cause explosions.  In the instant case, public safety concerns dictated an earlier arrest because Abdul-Latif and Mujahidh wanted to obtain machineguns and grenades in advance of their attack for training purposes.  In other ways, however, Abdul-Latif's case may be perceived as more aggravated because, for example, he demonstrated his commitment to the attack by recruiting another participant (Mujahidh) and arranging for him to travel to Seattle to engage in the plot.  In contrast, many of the other defendants were lone actors who did not go so far as recruiting other participants.

Although it is appropriate for the Court to consider the range of sentences that have been imposed in some of these past cases, any effort to compare the instant case to any one particular case is a fool's errand, given the vast differences in the facts and the backgrounds of each defendant.  However, when viewing the sentences imposed in the other cases from a more global perspective, a sentence of 19 years in the instant case appears reasonable and appropriate, and is well within the heartland of sentences imposed in the other cases.

GOVERNMENT'S SENTENCING MEMORANDUM - 25
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1    **V.    Conclusion.**

2        For the reasons set forth above, the government respectfully requests that the Court

3    sentence Abdul-Latif to a term of imprisonment of 19 years (228 months) and a term of

4    supervised release for life.

5        DATED this 19th day of March, 2013.

6                                    Respectfully submitted,

7                                    JENNY A. DURKAN
                                     United States Attorney
8
                                       /s Todd Greenberg
9                                    TODD GREENBERG
                                     MICHAEL DION
10                                   Assistant United States Attorneys
                                     United States Attorney's Office
11                                   700 Stewart Street, Suite 5220
                                     Seattle, Washington 98101-3903
12                                   Facsimile: 206-553-4440
                                     Phone: 206-553-2636
13                                   E-mail: Todd.Greenberg4@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S SENTENCING MEMORANDUM - 26
*United States v. Abdul-Latif*, No. CR11-228JLR

UNITED STATES ATTORNEY
700 Stewart Avenue, Suite 5220
Seattle, Washington 98101
(206) 553-7970

CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorneys of record for the defendant.

s/Janet K. Vos
JANET K. VOS
Paralegal Specialist
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: (206) 553-5041
FAX:   (206) 553-0755
E-mail:  Janet.Vos@usdoj.gov

GOVERNMENT'S SENTENCING MEMORANDUM - 27
*United States v. Abdul-Latif*, No. CR11-228JLR